UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANELLE SAMMUT,

Plaintiff, Case Number 25-11131

v. Honorable David M. Lawson

TELESOFT, LLC,

Defendant.
_______________________________________/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Janelle Sammut, a 55-year-old woman, brought this lawsuit after she was terminated from her 21-year career with the defendant company. She alleges that defendant Telesoft, LLC discriminated against her based on her age, sex, and disability, and that the defendant created a hostile work environment. The defendant maintains that the plaintiff was terminated as part of a workforce reduction plan. Telesoft has moved for summary judgment, and the Court heard oral argument on the motion on September 30, 2026. The plaintiff has offered sufficient evidence to avoid summary judgment on all her federal and state law claims except her claim for hostile work environment. Therefore, the Court will grant the motion as to that claim and deny it in all other respects.

I.

The parties agree on only a few of the background facts in this case. It is undisputed that plaintiff Sammut was terminated from her position as a sales representative for defendant Telesoft on January 16, 2025. Sammut is a 55-year-old woman. Defendant Telesoft, by its own account, is a U.S.-based technology company in the business of "Technology Expense Management," which involves "helping organizations understand, manage, and reduce costs associated with their

telecommunications and technology." The termination came at the end of a 21-year career with the company, much of which (since at least 2008) Sammut spent in sales positions. At the time of her termination, Sammut reported to defendant's head of Enterprise and Strategic Sales Teams, Michael Lucania. It also is undisputed that on January 16, 2024, Sammut suffered severe injuries after she slipped and fell in an icy parking lot while traveling to a business meeting. The claims in this case do not arise directly from the work-related injuries, which included a shattered dominant right arm and wrist requiring three surgeries, bruised ribs, long-term concussion, chronic pain syndrome and PTSD. Janelle Sammut dep., ECF No. 56-2, PageID.1311, 1315-16.

Beyond that, the parties' views of what the record shows diverge sharply. The following facts are substantiated by a plaintiff-favorable reading of the evidence before the Court. *See Miles-El v. Michigan*, --- F.4th ---, No. 25-1140, 2026 WL 3033075, at *2 (6th Cir. Oct. 9, 2026).

Sammut worked for Telesoft and a predecessor entity for 21 years. When she was terminated, her role was Regional Sales Director, which is a "direct sales" position. For that work, she was paid a salary of $103,000 per year plus sales-based commissions.

The sales division in which Sammut worked included at least 24 sales representatives along with Sammut. Sammut reported directly to the defendant's head of Enterprise and Strategic Sales Teams, Michael Lucania. Sales representatives were ranked on a weekly basis in terms of their "quota attainment" ("QA"), which was expressed as a percentage of an assigned annual sales quota that each rep had managed to fulfill in sales made. The QA performance, in turn, would determine the commission income that each representative was paid. Michael Lucania dep., ECF No. 56-4, PageID.1355. The defendant disclosed in discovery a copy of a weekly "Sales Leaderboard" for the week ended December 13, 2024. ECF No. 56-5, PageID.1376. As depicted on that leaderboard chart, Sammut was ranked 12th among the listed 24 reps. In its opening recitation of facts, Telesoft

admits that Sammut achieved between 56% and 88% of her annual assigned quota for each year from 2020 through 2024. Def. Br., ECF No. 37, PageID.695. Lucania conceded that, according to the end-of-year 2024 QA chart, only five out of 24 listed reps had achieved 100% of their assigned quota. Lucania dep. at PageID.1358. Lucania also admitted that Telesoft would not fire every rep that failed to achieve 100% QA. *Id.* at 1360.

Sammut provided documentation showing that in May 2024, she received a 10% increase in her salary for "Merit," which was triggered by her performance in achieving 74% of QA for 2023. *See* Merit Compensation Letter dated May 27, 2024, ECF No. 56-3. Lucania testified that merit-based salary increases were awarded "rarely." Lucania dep. at PageID.1355. Sammut testified that in other prior years she had made the "President's Club," which was achieved by reaching 110% of assigned sales quota. Jannelle Sammut dep., ECF No. 56-2, PageID.1281. Furthermore, she testified that the December 13, 2024 "leaderboard" chart did not reflect her actual performance in closing sales for 2024, because Lucania refused to give her credit for sales to Walgreens that had generated significant revenue for more than three months, which was contrary to how the compensation plan called for commissions to be credited. *Id.* at PageID.1326-27. Sammut also testified that she and fellow sales rep Rene McClure, who were the only two women over 50 in the sales department, were subjected to unexplained quota increases of more than 213% for 2024, while none of the other younger or male sales reps had their assigned quotas increased by such an excessive amount. *Id.* at 1329. According to the plaintiff, if she had been given credit for all the sales she actually booked in 2024, she should have been credited with more than $900,000 in sales instead of the approximately $630,000 shown on the December leaderboard, which would have placed her even higher than the middle of the pack in terms of QA.

Sammut also highlights evidence in the record that illuminates a somewhat contradictory and shifting narrative of the justification for and aftermath of her termination.

First, Sammut testified that she was informed of her termination by Lucania and defendant's HR Vice President, Kris Sleeper. During that Teams call, Sleeper told Sammut that there was an "across the board" performance review in the sales organization, and that Sammut was selected for termination due to her "poor performance" in meeting her quota. Sammut dep. at 1323. There was no mention during the call of the termination being part of any "workforce reduction." *Id.* at 1320. When Sammut asked if she would be placed on a performance improvement plan ("PIP"), which, according to the employee handbook, was required before a performance-based termination could take place, she was told there would be no PIP, and that the decision to terminate her had been approved by Telesoft's CEO and was final. *Id.* at 3121; *see also* Employee Handbook, ECF No. 37-3, PageID.856-57 ("If at some stage, it is highlighted that there is [sic] performance or conduct issues that need to be monitored, a performance improvement plan will be discussed. . . . [C]lear objectives will be given to the employee, which are to be met within a specified time frame. Performance and conduct will be monitored for a set period of days. The Manager will ensure adequate support is provided to the individual. At the end of the agreed period, or before if required, a meeting will take place to review the level of improvement that has occurred. . . . If there has been no significant improvement, then termination of employment may be applicable.").

Second, in contrast with the justification of poor individual performance espoused by Sleeper in the termination call, the defendant indicated in its first responses to interrogatories, served in October 2025, that six individuals were terminated in a "performance-based layoff," based on a review of 2024 sales performance, that the defendant's "Executive Leadership Team"

had "decided to terminate the lowest performing employees," and that the terminations were "based on metrics." Def.'s Resps. to Interrogs., ECF No. 56-10, PageID.1395-96. The parties engaged in litigation over this response, which culminated in a motion to compel members of the "Executive Leadership Team" to be identified and produced for depositions. The Court granted that motion and compelled the depositions, except that it permitted any members of the ELT who attested under oath that they had no involvement in the decision to terminate the plaintiff to be excused from appearing to testify. Order Granting Mot. to Compel, ECF No. 42. It appears that all of the members of the ELT disavowed involvement in the termination decision and none were deposed, except for Telesoft's CEO, Scott Gilbert, who testified that the ELT never met to discuss terminations of employees in early 2025, that he was "not involved" in any termination decisions, that he did not know how Lucania and HR had selected persons for termination, and that he was not able to identify any documents selecting persons to be terminated. Scott Gilbert dep., ECF No. 56-6, PageID.1380-81.

Third, Lucania contradicted defendant's discovery responses at his deposition, where he testified that four of the persons (all younger males in their 20s) who were identified in the defendant's October 2025 interrogatory responses *were not* terminated as part of any "performance based layoff," and that the four younger male employees were let go because "their entire department was something we were getting rid of." Lucania dep. at PageID.1353-54. Lucania said that only Rene McClure and the plaintiff — the only two over-50 women in the sales department — were terminated as part of the "performance layoff." The plaintiff highlights a slide deck produced by Telesoft, which indicated that the disbanded department — "Business Development Resources" ("BDR") — was eliminated because it "yielded essentially zero lead

generation" and was determined to be a waste of resources. Presentation Slides, ECF No. 56-8, PageID.1386.

Fourth, contradicting the defendant's contention that the plaintiff was "not replaced" after her termination, the plaintiff highlights evidence that in fact the sole survivor of the "disbanded" BDR organization, Austin Bovenzi, former director of the failed department, was reassigned to report to Lucania as a sales rep after his department was scrubbed. Lucania initially testified that Bovenzi did not receive any of Sammut's accounts, Lucania dep. at 1347, but when pressed and confronted with contrary documentation, Lucania conceded that Bovenzi received "some" of her accounts, *id.* at 1349. Sammut contends that the slide deck cited above "confirms" that Bovenzi in fact received "all" of her former accounts after she was let go; it is unclear how that conclusion follows from the content of the document, which only indicates that Lucania had a total of 10 sales reps reporting to him after the "reorganization" of the sales team, without mentioning Bovenzi or Sammut or any specific sales accounts by name. *See* Presentation Slides, PageID.1389. Nevertheless, the document does appear to corroborate the plaintiff's contention that, contrary to the defendant's position, Lucania had the same number of sales reps reporting to him after the "reduction in force" as he did before the two older female sales reps on his team were terminated (10 sales reps in total, both before and after).

The plaintiff also testified about "humiliating" comments relating to her injuries and disability that were voiced by Lucania after her 2024 slip-and-fall accident during a business trip. First, during a Teams call on an unspecified date, Lucania stated, "Let's let the handicap go first. Janelle, you're up," and "everyone laughed" and "thought it was funny." Sammut dep. at PageID.1285. Second, Sammut spoke "confidentially" to Lucania about an upcoming sales trip in Fall 2024, and she asked him about the destination because if the weather would be wintry she

would need to "prepare" due to her PTSD from the earlier accident, and Lucania "thought it was funny" and "announced it to the entire team" on the next Teams call. *Id.* at 1286. Third, Lucania made a joke on another unspecified date that "they should wrap [the plaintiff] in bubble wrap" for a business trip; Lucania later repeated the joke during a sales call with customers, who laughed about it, which Sammut found "humiliating." *Id.* at 1286-88.

Sammut complained about the humiliating commentary to several managers including the defendant's Director of Renewals, Terry O'Brien, and HR staffer Tara Harn, but her complaints were not investigated, and the response to all her complaints was "That's just Mike" (referring to Lucania). Sammut dep. at 1284-86, 1292. The plaintiff testified that the derogatory comments were repeated by Lucania and echoed by co-workers "all the time" throughout 2024, and that Lucania "never stopped" the demeaning commentary. *Id.* at 1292, 1337.

Finally, the plaintiff testified that she was subjected to "hypercritical" questions about her sales record during an early 2024 sales division conference call, and that Lucania did not pose similarly critical questions to other sales reps and instead commended their performance. *Id.* at 1286, 1290. However, the plaintiff did not identify how any of the questions posed during the sales conference call were related to her disability.

The plaintiff filed her complaint in this case on April 18, 2025 pleading claims of unlawful discrimination on the basis of age, sex, and disability, and hostile work environment harassment, under the State of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2201 *et seq.*, and Persons With Disabilities Discrimination Act (PWDCRA), Mich. Comp. Laws § 37.1101 *et seq.*; the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*. The complaint also pleads a claim of retaliation for the exercise of rights under the Michigan Workers' Disability

Compensation Act. Counts I and VIII allege disability discrimination under the PWDCRA and ADA. Counts II and VI allege sex discrimination under ELCRA and Title VII. Counts III and VII allege age discrimination under ELCRA and the ADEA. Counts IV and IX allege hostile work environment harassment based on disability under the PWDCRA and ADA. Count V, which alleged retaliation under the Michigan Workers' Disability Compensation Act, was dismissed by stipulation.

II.

Telesoft moves for summary judgment of dismissal on all the remaining counts of the complaint. It contends that the plaintiff cannot prove a *prima facie* case because she offers no evidence on two of the elements: that she is qualified for the position, and that the circumstances of her termination support an inference of discriminatory intent, regardless of whether the basis is age, sex, or disability. The defendant contends that the plaintiff fails on the qualification component because her admissions that she failed to meet her assigned sales quotas in every year from 2020 through 2024 is sufficient to provide a legitimate, performance-based ground for the termination. It argues that she falls short on the discriminatory intent component because she has failed to offer circumstantial or statistical proof of unlawful discrimination, as she is required to do in a case such as this where the plaintiff was terminated as part of a broader "workforce reduction" initiative, and that her personal belief that she was the victim of discrimination is insufficient. It also contends that the plaintiff has not shown that she was replaced by a worker outside the protected class. The defendant offers a novel argument on causation, contending that the plaintiff has failed to show that any of her three protected characteristics was the singular "but-for" cause of her termination, because when asked she insisted that "all of them" were the cause,

and therefore there cannot be any proof that any one of the protected characteristics was the "but for" cause of the adverse action.

The defendant also maintains that the plaintiff has not shown that its targeted workforce reduction justification was a pretext for discrimination because the plaintiff admitted that she failed to meet her sales quota in 2024.

Attacking the hostile work environment claim, the defendant argues that the plaintiff only identified three off-the-cuff remarks made over the course of a year during 2024, which, although offensive or insensitive, were not accompanied by any threats or physical intimidation, and do not rise to the level of "severe" or "pervasive" harassment that interfered with the plaintiff's performance of her duties so as to alter the conditions of her employment.

The plaintiff responds that there was no actual workforce reduction, since the plaintiff's department had the same number of sales reps reporting to the supervisor as it did before her termination. She also takes issue with the defendant's attempt to constrict the relevant pool of comparators, and she points to evidence that the two over 50-year-old females were treated less favorably than those outside the protected class. And she cites several items of evidence which, she says, establishes that the workforce reduction rationale is a pretext for discrimination. Finally, she insists that the totality of the circumstances establishes the pervasiveness of the harassment leveled against her because of her disability, demonstrating a hostile environment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A.

The familiar *McDonnell-Douglas* burden-shifting framework still applies to the evaluation of a plaintiff's circumstantial case of discrimination at the summary judgment stage. *Patterson v. Kent State Univ.*, 155 F.4th 635, 645 (6th Cir. 2025) (Title VII case); *Pannek v. U.S. Bank Nat'l Ass'n*, --- F.4th ---, No. 25-3706, 2026 WL 2277080, at *10 (6th Cir. Aug. 7, 2026) (ADEA case); *Tumbleson v. Lakota Loc. Sch. Dist.*, 175 F.4th 773, 780 (6th Cir. 2026) (ADA case). Under that framework, the plaintiff must offer evidence establishing a *prima facie* case showing that adverse action was caused by unlawful discrimination, thus triggering the defendant's burden of showing that there was a legitimate reason for the adverse action, which then shifts the burden back to the plaintiff of coming forward with evidence that the defendant's legitimate reason was instead a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973). Parallel claims of discrimination brought under the federal anti-discrimination statutes and

ELCRA are subject to the same burden-shifting analytical framework. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 575 (6th Cir. 2023) ("Just like the age-discrimination claims, Hrdlicka's claims of sex and race discrimination rely on circumstantial evidence and therefore utilize the *McDonnell Douglas* framework.").

1.

Regardless of the type of discrimination alleged, a *prima facie* case generally consists of four elements. A plaintiff must offer evidence demonstrating that (1) she is a member of protected class, (2) she suffered an adverse employment action, (3) she was qualified for her position, and (4) she was treated less favorably than someone outside of her protected class. *Patterson v. Kent State Univ.*, 155 F.4th 635, 645 (6th Cir. 2025); *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024); *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). When a termination arises as part of a workforce reduction, the Sixth Circuit "[has] modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Ibid.* (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009)). To accomplish this, the plaintiff "must provide circumstantial or statistical evidence that [the employer] singled [her] out for termination because of [her] age." *Ibid.*

Telesoft contends that the plaintiff has not offered sufficient evidence on the fourth element to establish the heightened *prima facie* showing applicable to "workforce reduction" cases. The defendant is incorrect for two reasons: (1) there is a genuine dispute of material fact about whether any supposed "workforce reduction" actually occurred, primarily due to conflicting evidence that raises serious doubts about the credibility of its factual position, and (2) there is a genuine dispute

of material fact about whether the plaintiff was "replaced" by former BDR department director Austin Bovenzi.

As the plaintiff points out, the defendant's narrative of the termination process has varied materially over time. Sammut testified that she was not told about any "workforce reduction" when she was informed about the termination. During this litigation, the defendant initially identified four other younger male employees who it said were terminated as part of a workforce reduction, and it also stated that the persons terminated were the "lowest performers" in the sales organization based on "metrics," and that the termination decision was made by the "Executive Leadership Team." The defendant later walked back that position and disavowed any involvement by ELT members in the terminations. Michael Lucania further confounded the record at his deposition when he testified that the four younger male employees who were let go were not part of any "performance layoff" but were fired because their entire department was disbanded.

Moreover, Telesoft's assertion that it selected the "lowest performers" for the layoff is belied by its own "Sales Leaderboard" chart showing that at the close of 2024, Sammut and the other over-50 female sales rep who was terminated (Rene McClure) significantly outperformed eight other younger males and one younger female (in plaintiff's case) and five other lower performing younger male co-workers (in Rene McClure's case).

Finally, it is questionable whether any "reduction" of the sales workforce occurred, where Lucania ended up with the same total number of sales reps reporting to him after the termination of the only two older women on the team. All of that evidence together combines to raise a significant factual dispute about whether any "workforce reduction" in fact occurred; the jury will have to decide, and, based in this record, the plaintiff is not required at this stage to meet any

elevated standard of proof in order to make out a viable *prima facie* case on her discrimination claims.

Moreover, even if the plaintiff were required to meet an elevated standard, she has raised a genuine question of material fact about whether she was "replaced" after her termination. It is well established that an older employee is not "replaced" where another existing employee is assigned to perform her duties in addition to previously assigned responsibilities. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) ("[W]e have consistently found that a plaintiff's job was simply eliminated when the plaintiff's former duties were assumed by a younger employee, who performed them in addition to his other functions."). But where an existing employee's position is "fundamentally changed" by a reassignment to take over a dismissed older employee's workload, then a "replacement" has occurred. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522, (6th Cir. 1997) ("By promoting Larry Jordan from part-time to full-time status, Sears effectively replaced Tinker by reassigning another employee to assume Tinker's duties. This type of reassignment is analogous to hiring a new employee to cover the terminated employee's duties. Larry Jordan did not assume Tinker's duties in addition to his own part-time duties. Rather, Sears had to fundamentally change the nature of his employment, by promoting him to full-time status, in order to have him assume Tinker's duties in addition to his own."). In this case, it appears to be undisputed that the entire department that Austin Bovenzi presided over was eliminated, which necessarily eliminated *all* of his former responsibilities, and Bovenzi then was reassigned to work under Lucania, and admittedly received at least "some" of the plaintiff's former sales territory. The record is unclear about whether Bovenzi received "all" of Sammut's formerly assigned accounts, but there also is no evidence suggesting that Bovenzi retained any of the duties formerly assigned to him as BDR supervisor. At a minimum, it cannot

be decided as a matter of law that the plaintiff was not "replaced"; the jury will need to consider all of the evidence to weigh whether Bovenzi replaced the plaintiff.

2.

The defendant also argues that the plaintiff has not satisfied the third element of her *prima facie* case, which requires her to show that she was qualified for her position, by pointing to evidence that she failed to satisfy the assigned sales quota over multiple years. However, as detailed in the factual summary above, there is evidence that most of the defendant's sales reps — including the plaintiff for at least five years running — failed to achieve 100% of their assigned quotas, and yet they were not fired. Sammut also testified that in mid-2024 she received a "rare" merit increase of 10% of her base salary based on her sales performance for 2023 — a year in which she did not reach 100% of QA. Telesoft's own documents in the form of the Sales Leaderboard also suggest that Sammut outperformed most of her younger and male co-workers in the sales division, none of whom were terminated.

Sammut also highlights her testimony that she and the only other over-50 female sales rep were subjected to extraordinary and unexplained increases in their assigned quotas of more than 200% for 2024, and that none of the other sales reps were subjected to such severe hikes in their sales benchmarks. Finally, Sammut testified that Telesoft's documents — which still show Sammut outperforming most other sales reps — also falsified and grossly understated her actual performance, due to Lucania's refusal properly to credit all of Sammut's 2024 sales.

Moreover, even if all that were not enough to establish a triable issue, the defendant's argument on this point is fundamentally flawed and contrary to the prevailing case law, because in its attack on the plaintiff's "qualifications" (an element of the *prima facie* case), it points to nothing more than its own purported — and highly questionable — allegedly non-discriminatory

basis for the termination decision, that is, a workforce reduction. As the Sixth Circuit has explained, "[a]t the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). At this stage, the Court must set aside and should not consider the defendant's proffered non-discriminatory justification for the adverse action. To do so, explains the *en banc* Sixth Circuit, "would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* at 574-75. "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576.

Here, it is uncontested that by 2024, Sammut had at least 16 years of sales experience in various positions with the defendant and its predecessor entity. She has highlighted favorable performance reviews, receipt of the "President's Club" award for sales performance, and receipt of a merit salary increase just seven months before her dismissal, all of which were based on her outstanding performance as a sales rep. Sammut's lengthy experience and demonstration of the practical skills required to perform as a sales rep is sufficient to establish a question of fact about whether she was qualified to perform the job that she had held for many years. The defendant has not identified any objective criteria for the position that the plaintiff did not satisfy in any year, including 2024, and it has not identified any way in which the objective qualifications for the job changed so as to render her unqualified to continue in the position.

Certainly, a qualified individual must perform "at a level which met his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)

(quotation marks omitted). But Sammut has supplied evidence of her commendable performance in prior years showing that she did so perform for at least the five years preceding her termination; that is all that is required. And, as discussed above, the record evidence certainly is not conclusive on whether the plaintiff's performance in 2024 failed to satisfy the "legitimate expectations" of her employer.

The defendant concedes that the plaintiff has satisfied the first two elements of a *prima facie* case. The record demonstrates that she has put forth sufficient evidence to all of the *prima facie* elements to move beyond the first stage of the *McDonnell-Douglas* burden-shifting protocol.

B.

Telesoft contends that the plaintiff was terminated as part of a workforce reduction plan. Sammut contends that this purported reason was a pretext for discrimination. The plaintiff has supplied ample evidence suggesting that the justification of her termination based on "poor performance" was pretextual. "An employee 'can show pretext in three interrelated ways: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the employer's action, or (3) that the proffered reason was insufficient to motivate the employer's action.'" *Pannek*, 2026 WL 2277080, at *5 (quoting *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350-51 (6th Cir. 2021)). "[A]n employee 'does not need to prove pretext; [she] only needs to show that the question of pretext is a genuine factual dispute.'" *Ibid.* (quoting *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 667 (6th Cir. 2020)). Furthermore, "an employer's shifting termination rationales [] are evidence that the proffered rationale may not have been the true motivation for the employer's action." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 327-28 (6th Cir. 2021). Here, the plaintiff has supplied evidence suggesting that the performance justification had no basis in fact and was not sufficient to justify termination. She

also has highlighted a suspiciously fluid narrative of the termination process that suggests dissembling by the defendant about the true motive for the plaintiff's termination.

First, plaintiff submitted the defendant's own "Sales Leaderboard" chart from the close of 2024 showing that she outperformed other male colleagues who were not terminated in terms of her quota attainment for the year. Moreover, she was granted a merit increase — a rarely given incentive for outstanding performance, according to Lucania — based on her 2023 performance. The plaintiff never attained 100% QA in prior years, and Lucania conceded that most sales reps do not achieve 100% of their assigned quotas, yet most of the younger, male, and non-disabled reps were retained despite this routine "failure" of performance. That evidence suggests both that the performance justification was unfounded, and that the plaintiff's 2024 QA performance was not sufficient to justify her termination in the usual course of business.

Second, the plaintiff has highlighted a suspiciously fluid narrative of the termination process. The defendant's supervisor and HR representative never mentioned a "workforce reduction" when the plaintiff was terminated. The defendant initially took the position in litigation that a workforce reduction was conducted, but then walked back and disavowed that position, later disclaiming any involvement of its "Executive Leadership Team" in any such initiative, and failing to produce any documents substantiating any broadly based "performance layoff." Lucania further undermined the narrative at his deposition where he testified that four of the six employees initially identified by the defendant as being affected by the layoff were not terminated for performance reasons but instead were let go because their department was eliminated. That is further evidence that a fact finder could rely on when concluding that the purportedly legitimate ground for termination was merely pretext for unlawful discrimination.

The plaintiff has presented a sufficient record to survive summary judgment and to put her case alleging pretext before the jury.

C.

The "burdens" that are "shifted" under the *McDonnell-Douglas* framework are the burdens of production. "'Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process.'" *Pannek*, 2026 WL 2277080, at *3 (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). The defendant argues that when all is said and done, the plaintiff falls short of proving that illegal discrimination based on one discrete protected characteristic was the cause of the adverse action against her.

There are different levels of proof of causation required for discrimination claims compared to retaliation claims. *Noel v. Challenge Mfg. Holdings, Inc.*, No. 25-1776, 2026 WL 2268420, at *5 (6th Cir. Aug. 6, 2026). "The antidiscrimination provision allows an employee to prove that an adverse action was tainted by illegal race or sex discrimination if the employee's race or sex 'was a *motivating factor* for [that action], even though other factors also motivated' it." *Ibid.* (quoting 42 U.S.C. § 2000e-2(m) (emphasis added)). "The retaliation provision, by contrast, requires an employee to prove that the filing of a discrimination charge was a but-for cause of the challenged adverse action." *Ibid.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). The plaintiff has not pleaded a retaliation claim.

Nevertheless, the defendant takes the novel position, which is unsupported by any legal authority, that the plaintiff cannot establish "but for" causation among any one of her protected characteristics because she maintains that animus toward *all* of her protected attributes influenced the decision to terminate her employment. The case law holds decidedly to the contrary. The Sixth Circuit readily recognizes "intersectional" claims of discrimination where animus toward a

plaintiff based on more than one protected characteristic is in play. As the court of appeals has explained:

> [B]both classifications — race and sex — are protected by Title VII. These characteristics do not exist in isolation. African American women are subjected to unique stereotypes that neither African American men nor white women must endure. And Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds. Thus in *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999), we held that a plaintiff could rely on evidence of religious harassment to buttress his claim for racial harassment, even though the religious harassment claim could not survive independently.

*Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014) (citations omitted). The defendant has not cited any legal authority endorsing the proposition that a plaintiff exhibiting protected characteristics covered by several sources of statutory protection (e.g., the ADA, ADEA, and Title VII) stands on any different footing before the law compared with a claimant asserting multiple bases of discrimination proscribed by a single enactment like Title VII. Contrary to the defendant's position, "'but-for' causation does not require proof that [discrimination] was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (6th Cir. 2013) (emphasis added).

"Under both Title VII and the ADA, an employer can have multiple 'but-for' causes behind a decision. Put differently, an adverse action can have several motivations that are each independently sufficient to prompt the employer's decision. . . . These [multiple] motives are not mutually exclusive." *Odell v. Kalitta Air, LLC*, 678 F. Supp. 3d 904, 923-24 (E.D. Mich. 2023), *aff'd*, 107 F.4th 523 (6th Cir. 2024) (citing *Zann Kwan*, *supra.*); *see also DeVooght v. City of Warren*, No. 20-3168, 2023 WL 2637369, at *7 (E.D. Mich. Mar. 24, 2023) ("There may be multiple 'but-for' causes of the materially adverse action, and the protected activity must be a cause but need not be the sole cause.") (citing *Burrage v. United States*, 571 U.S. 204, 211 (2014)

("The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so — if, so to speak, it was the straw that broke the camel's back.")).

Here, the plaintiff has pointed to evidence that her protected characteristics either alone or in combination motivated her employer's illegal conduct. She has identified at least one co-worker who was younger than her and female who performed worse and was retained; she points to at least eight co-workers who were both younger and male who performed worse and were not terminated; and there is no suggestion in the record that any of the workers who performed worse and still kept their jobs were similarly situated in terms of disability — so far as the record shows none of the retained sales reps were disabled. It does not matter under the law whether the defendant's animus was based on hostility toward only one characteristic, or a combination of two, or all of them; the anti-discrimination statutes "do[] not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds." *Shazor*, 744 F.3d at 958. The defendant is not entitled to judgment as a matter of law on the ground that plaintiff's causation case fails due to the allegation of multiple protected factors that may have motivated the unlawful discrimination.

D.

Telesoft also contends that the plaintiff has not offered sufficient proof to sustain her hostile work environment claim. Federal "courts recognize hostile-work-environment claims under the anti-discrimination provisions of the ADA." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 869 (6th Cir. 2025) (citing *Bryant v. McDonough*, 72 F.4th 149, 151-52 (6th Cir. 2023) (observing that the elements for a hostile-work-environment claim are consistent across the various anti-discrimination statutes)). "The hostile-work-environment cause of action allows a plaintiff to sue for discrimination when sufficiently abusive harassment adversely affects a term, condition, or

privilege' of employment." *Ibid.* (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (quotation marks omitted)). "Just like Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, and other statutes that comprise the wider statutory scheme that protects employees in the workplace nationwide, the ADA and Michigan's disability civil rights law prohibit discrimination that affects the 'terms, conditions, or privileges of employment.'" *Ibid.* (quoting 42 U.S.C. § 12112(a); Mich. Comp. Laws § 37.1202(1)(b)) (cleaned up). The Sixth Circuit recently reviewed and restated the framework for analysis of hostile work environment claims in light of modern Supreme Court precedent. The modern formulation of the analytical pattern "is as follows: a plaintiff must show that (1) [s]he is disabled; (2) [s]he was subjected to harassment, either through words or actions, based on [her] disability; (3) the harassment created an objectively intimidating, hostile, or offensive work environment that produced some harm respecting an identifiable term or condition of employment; and (4) there is some basis of liability on the part of the employer." *Kellar*, 157 F.4th at 873 (citing *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024); *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 898, 904, 906 (6th Cir. 2024); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996)) (cleaned up). "What the [plaintiff] does not have to show, according to the relevant text, is that the harm incurred was 'significant.' Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow*, *supra.*

The plaintiff has presented sufficient evidence to suggest that the hostile comments directed toward her by Lucania and disparaging her disability were "pervasive," but she has failed to identify any evidence suggesting that the running commentary on her condition altered the terms or conditions of her employment or in any way affected the performance of her job. In fact, the plaintiff conspicuously highlights her outstanding performance throughout 2024 notwithstanding

both her physical condition and the offensive environment. The conduct evidenced by the record certainly was offensive, and plaintiff plausibly suggests that it was persistent. But she has failed to connect the offensive conduct to any actionable detriment in her employment situation.

"A recurring point in the Supreme Court's opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' and that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also id.* at 22 ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."). "In order to [establish a hostile environment based on] 'repeated slurs,' the plaintiff must show that the alleged [] harassment constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to perform the tasks required by the employer. In establishing the requisite adverse effect on work performance, however, the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1998).

The conduct evidenced here consists of commentary in the form of crude, offensive jokes and jabs about the plaintiff's condition, which were repeated frequently, based on the plaintiff's testimony, throughout most of 2024. Notwithstanding her testimony that she felt "humiliated" by the degrading commentary, what is conspicuously absent from the record is any evidence that the insulting remarks affected the plaintiff's performance of her duties in any way. In the absence of any discernible effect on job performance, the plaintiff has failed to identify hostile activity that affected the "terms and conditions" of her employment. She also has not identified any aggravating factors rendering the insults sufficiently "severe" to be actionable, in terms of involving overt threats or physical intimidation. *See Hamm v. Pullman SST, Inc.*, No. 22-11456, 2025 WL 792869, at *5 (E.D. Mich. Mar. 12, 2025), *aff'd*, 167 F.4th 382 (6th Cir. 2026) ("Viewed in the most generous light, the plaintiff's testimony establishes around a dozen incidents over the course of six months in which various co-workers referred to the plaintiff using insults or insinuations that could be viewed as related to his sexual orientation. However, the plaintiff has not presented any evidence that any of the encounters involved physical threats or intimidation, and he did not testify that any of the incidents in any way interfered with the performance of his work."); *see also Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 841 (6th Cir. 2024) ("[The plaintiff did not allege that the harassment was physically threatening [and] [h]er conclusory assertions that defendants' actions 'unreasonably interfered with [her] work performance,' without alleging supporting factual allegations, is insufficient.").

The record here describes conduct that amounts to boorish comments, insensitivity, and offensive utterances; it is well established, though, that something more is required to establish a hostile environment. *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 350 (6th Cir. 2020) ("Kheibari conceded that he faced no physical threats, instead facing only some offensive comments. And

this court holds much more aggressive and bigoted conduct as insufficiently severe."); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) ("[The] coworkers' comments [about eating watermelon and fried chicken] — were offensive but not particularly serious or threatening; rather, they fall into the 'offensive utterance' category."); *c.f. Jones v. Fluor Facility & Plant Servs.*, No. 24-5249, 2025 WL 707869, at *10 (6th Cir. Mar. 5, 2025) ("This harassment directly affected the day-to-day conditions of Schlosser's work environment. She was ostracized when she was singled among her male counterparts for discipline and prohibited from diving or driving a company vehicle for a period. Some of Schlosser's issues temporarily resolved after she switched dive teams — she was allowed to resume diving for a few weeks — but she faced continual verbal abuse from a coworker on her new team. This coworker tried to physically push her, and verbally threatened her with firing, a threat typical for Schlosser's time at VRH, where Schlosser was consistently fielding threats that she would be fired and insults that she was not qualified to perform her job. . . . [T]he totality of the circumstances could reasonably indicate that Schlosser suffered pervasive harassment that altered her job environment, conditions, and performance.") (citing *Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024)) (cleaned up).

Because the plaintiff has failed to present evidence of actionable harassment, her hostile work environment claims (Counts IV and IX) are subject to dismissal.

III.

The plaintiff has offered evidence that is sufficient to create triable fact issues on all the elements of her claims except for her claim of hostile work environment.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 37) is **GRANTED IN PART**. Counts IV and IX of the complaint alleging hostile work environment disability-based discrimination are **DISMISSED WITH PREJUDICE**. The motion

is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: October 19, 2026